IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT MCGEE,
                              Plaintiff,

        v.

THE PROCTER & GAMBLE
DISTRIBUTING CO., and
THE PROCTER & GAMBLE CO.,
                              Defendants.

Civil Action No. 02-1121

OPINION

POLLAK, J.

Currently before the court is the defendants' motion for summary judgment on all of the employment discrimination claims brought by the plaintiff, Robert McGee. McGee claims that he was unfairly discriminated against by his employer, defendant Procter & Gamble Distributing Company ("P & G") – a wholly owned subsidiary of defendant Procter & Gamble Company – on account of disability. McGee further claims that P & G retaliated against him for opposing conduct that violated disability law. Finally, McGee brings a number of state law contract claims. For the reasons given below, defendants' motion for summary judgment will be granted on all claims save for plaintiff's disability

1

retaliation claim.

**Facts**

From the evidence in the record, the pertinent facts are as follows.  McGee resides in East Stroudsburg, Pennsylvania.[1]  He worked as a salesman for P & G out of the office in King of Prussia, Pennsylvania from 1976 until April of 2000, when he began a leave of absence for disability.  His last position at P & G involved sales of products to large corporations.  The disability which caused him to take this final leave of absence was triggered, according to McGee, by the fact that he was chosen for "unstaffing" by P & G during a reorganization of the company's sales operations.  At the time of his unstaffing in 2000, McGee was 48 years old.

The events that led to McGee's leave of absence began in November of 1996, when Mike Guenther became the operations manager of plaintiff's team at P & G.  When Guenther arrived on McGee's team, McGee had a job performance level of "1" – the highest rating.  However, not long after the arrival of Guenther, he and McGee began having disagreements, and, in 1997, McGee's performance rating was downgraded from "1" to "2."  Operations managers such as Guenther recommend performance ratings, but the "Team Leader" – here, one Marty Monserez – has the ultimate authority in assigning

_____

[1] East Stroudsburg is in eastern Pennsylvania, approximately one hundred miles north of Philadelphia.

performance level ratings.  It was Monserez who assigned McGee a 1997 rating of "2."

McGee alleges that, during this period, Guenther was abusive to McGee, and, as a result, McGee began to get depressed.  McGee complained about Guenther to Monserez on March 12, 1998, and McGee met with two human resources representatives about four days later.  McGee presented them with a ten-page list, detailing 19 separate incidents of mistreatment by Guenther.  The most egregious of these were Guenther asking plaintiff to perform the "strip tease act [plaintiff was] so well known for" and to "bend your ass over and demonstrate . . . the best uses of Vicks Vapo Rub."  Other complaints included Guenther's failure to defend McGee from criticism of another employee, Guenther unreasonably blaming McGee for various problems, and Guenther's repeated suggestions that  McGee was "stupid" or otherwise unqualified for his job.  McGee also alleged that Guenther laughed during an August 19, 1997 meeting in which P & G employee Art Sprague reportedly stated, "it sure looks to me like [McGee] has AIDS, don't you folks agree."  P & G investigated McGee's complaints, and Monserez ultimately concluded that the complaints were well-founded.  Consequently, Guenther was removed from his supervisory position in April of 1998.

Also on March 12, 1998, McGee began a three-month leave of absence that lasted until June 2, 1998.  McGee took this leave to treat his depression, acute anxiety, and hypertension.  He claims that these disorders affected his appetite, sleeping, thinking, concentrating, interacting with others, and capacity to enjoy life.  Additionally, McGee

3

claims that these disorders led to recurring panic attacks.

By the time McGee returned to work in June of 1998, a new supervisor – Clint Schmidt – had replaced Guenther.  McGee asserts that he nonetheless continued to have problems arising out of his depression, but these problems were not severe enough to stop him from working for the next twenty-one months.  During this period, McGee claims that his pace was slower and that he had to work much harder to keep on top of things. While Schmidt served as McGee's supervisor, McGee's performance rating did not change from the level "2" he had been previously assigned under Guenther.

In early 1999, P & G announced that it was reducing and reorganizing its sales force.  As an incentive for employees to continue to work well through this reorganization and reduction period, P & G announced that it was forming an employee recognition program in which P & G would award up to 2000 grants of 50 stock options each to employees who demonstrated "exemplary organizational, technical, or business accomplishments."  These shares – known as "Recognition Shares" – were first distributed in early 1999 for achievement in the previous year.  McGee did not receive any of these Recognition Shares in 1999 or at any other time before he went on disability leave in April of 2000.

As a significant part of its reorganization, P & G converted most of its customer-focused sales teams to geographic-based sales teams.  One of the newly created geographic-based teams was designed to service customers in eastern and central

4

Pennsylvania.[2]  Because McGee had a significant customer base in this area, most of his customers were transferred to the new, geographic-based team.  The customers who were not transferred were serviced by a reduced version of McGee's team.  McGee, however, was not selected from his team as one of the members of the reduced team.  Monserez claims that he made this decision to unstaff McGee because he believed that other employees were better skilled at strategic thinking and/or technical analysis than McGee.

Because McGee was unstaffed, he became an available candidate for staffing on the geographic-based team created to service the eastern and central parts of Pennsylvania, which was headed by Kirk Trofholz.[3]  Trofholz had two candidates who lived in eastern/central Pennsylvania, and who were available to service that area – McGee and one other P & G employee, James Welde.  Though Trofholz felt that both possessed a similar skill level and both had the same rating level of "2," the other candidate was chosen because he lived closer to four of the five eastern/central

---

[2] Specifically, the team was designed to serve customers in the eastern/central Pennsylvania cities of Blandon, Middleton, Lemoyne, Pine Grove, and Yardley.

[3] There is disagreement between the parties about the role individuals played in the 2000 staffing decisions.  There were two staffing decisions.  The first was to "unstaff" McGee from his former customer-focused team, which the parties agree was a decision made by Monserez.  The second decision involved what to do with the newly available McGee.  P & G now asserts that this second decision was made by Trofholz, though McGee notes that P & G had earlier asserted in a letter to McGee's attorney that " Trofholz was not involved in the decision to select Plaintiff for non-assignment in 2000." McGee Exh. Q.  It is unclear from the record whether this initial P & G assertion was in reference to the first decision to unstaff McGee – indisputably made by Monserez – or whether it refers to the second decision to not pick McGee as a sales representative in eastern/central Pennsylvania on the newly formed geographic-based team.

Pennsylvania cities with P & G clients.  McGee, however, claims that small distance

differences were not typically a controlling factor in these decisions, and, moreover, he, in

fact, lived closer than Welde to the relevant cities.  Finally, in making his staffing

decisions, Trofholz testified that he was unaware of McGee's complaint against

Guenther.  *See* Trofholz Decl. ¶ 12.

Because McGee was not selected to work on the team newly created to service

eastern and central Pennsylvania, P & G informed McGee that, as of June 30, 2000, his

job would be eliminated.  P & G further informed McGee that the company would find

him a sales position in the next few months somewhere in the United States and that he

would likely be required to relocate.  Then, in April of 2000, McGee's doctor

recommended that he stop working.  In May of 2000, P & G offered McGee a job in

Pittsburgh.  He declined this offer because he would have had to move.  In July of 2000,

McGee was offered a position on a cosmetics team that would not have required him to

move, but would have required him to learn about new products.  McGee also declined

this offer.  Though tentatively scheduled to return to work on October 2, 2000, McGee

has not been back at work since April of 2000.[4]

_____

[4] The parties appear to disagree over whether McGee has been effectively
terminated from his employment.  In his first amended complaint, McGee describes his
non-staffing in 2000 as selection for layoff, and later alleges that defendants "improperly
denied Plaintiff benefits, rights and expectancies due him and improperly qualified,
conditioned and terminated his employment[.]"  *See* First Amended Complaint at 3, 20.
Defendants state only that McGee's job was eliminated and that – unless McGee had
chosen to accept voluntary separation – P & G would have found him a new position.  *See*
(continued...)

**McGee's Causes of Action**

McGee raised six causes of action in his amended complaint.  In McGee's memorandum of law supporting his opposition to P & G's summary judgment motion, McGee withdrew one claim – discrimination contravening the Rehabilitation Act, 29 U.S.C. § 794 et seq.  Consequently, defendants' motion for summary judgment with respect to this withdrawn claim will be granted.  McGee's remaining five claims are (1) discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et. seq. ("ADA"); (2) discrimination prohibited by the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951; (3) breach of contract; (4) breach of the implied duty of good faith and fair dealing; and (5) negligent supervision.  Defendants move for summary judgment on each of these claims.

Additionally, McGee attempts to raise a new claim in the memorandum of law that accompanied his opposition to summary judgment.  He is now also claiming age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.  *See* Pl. Mem. of Law at 2.  Pursuant to Federal Rules of Civil Procedure 15(a), a party may freely amend its complaint within 20 days of service.  Failing this, a

---

[4](...continued)
Defendants' Statement of Material Facts at 11.  Because McGee went on disability leave before his position was officially eliminated, it appears from the record that he is, at least nominally, still employed by P & G.  However, viewing all facts and drawing all inferences in the light most favorable to McGee – the non-moving party – favors a finding that, for the purposes of this summary judgment motion, McGee's employment at P & G has been terminated.

party may only amend its complaint by "by leave of court or by written consent of the adverse party." *Id*. Nonetheless, "leave shall be freely given when justice so requires." *Id*. The Third Circuit has concluded that pursuant to Rule 15(a) "a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir. 2005) (citing *Grayson v. Mayview State Hosp*., 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962))). Pursuant to these standards, this court will decline to hear McGee's newly articulated ADEA age discrimination claim.

In raising his ADEA age discrimination claim, McGee has neither moved for "leave of the court" nor has he received the "written consent of the adverse party." Moreover, even if his articulation of the ADEA claim might be construed as a motion to amend his complaint, the motion will be denied for his lack of diligence in presenting this claim. McGee filed his initial complaint in March of 2002 and his amended complaint in April of 2002, which was two years after leaving work in April of 2000. After requesting additional time to respond to defendants' motion for summary judgment, McGee did not present his ADEA claim until he filed his memorandum of law in opposition to the summary judgment motion, which was filed in November of 2004. At no point has McGee explained why he did not bring his ADEA claim until two and one-half years after

8

the filing of his amended complaint.  Consequently, McGee's constructive motion to

amend his complaint to include the newly raised age discrimination ADEA claim will be

denied.  *Hill*, 411 F.3d at 134 n.26 (noting that a district court may properly decline to

grant a Rule 15(a) motion for lack of diligence when the party has waited for more than

two years before raising the claim for the first time and failing to explain the delay).

The five remaining claims contested in McGee's amended complaint are addressed

below.


**Legal Standard**

Summary judgment should be granted where "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue of material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c); *see also IFC Interconsult, AG v. Safeguard

Int'l Partners, L.L.C.*, 438 F.3d 298, 317 (3d Cir. 2006).  A genuine issue of material fact

exists where the jury could reasonably find for the non-moving party.  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over facts is material where it

could affect the outcome of the case.  *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir.

2003).

A party seeking the grant of summary judgment carries the initial burden of

informing the district court of the basis for its motion, and identifying the portions of the

record that show that there is no genuine issue of material fact.  *Celotex v. Catrett*, 477

U.S. 317, 322 (1986); *Belitskus*, 343 F.3d at 639.  Where, as here, the non-moving party

bears the burden of proof, the moving party must show that the non-moving party cannot

support its case with the evidence in the record.  *Celotex*, 477 U.S. at 325.  In rebuttal, the

non-moving party must then identify facts that create a genuine issue of dispute for trial.

Fed. R. Civ. P. 56(e); *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112

(3d Cir. 1996).  In determining whether to grant summary judgment, the court must view

all facts and draw all inferences in the light most favorable to the non-moving party.

*Anderson*, 477 U.S. at 255; *IFC Interconsult*, 438 F.3d at 317.


**Discussion**

    1.    <u>ADA Claims</u>

        a.    <u>Disability Discrimination under the ADA</u>

McGee first claims that he was discriminated against in violation of the ADA.  To

be eligible for relief under the ADA, a plaintiff must show that he or she is a "qualified

individual with a disability," and that he or she suffered an adverse employment action as

a result of discrimination.  *Tice v. Centre Area Transportation Authority*, 247 F.3d 506,

512 (3d Cir. 2001).  The ADA defines a "qualified individual with a disability" as "an

individual with a disability who, with or without reasonable accommodation, can perform

the essential functions of the employment position that such individual holds or desires."

42 U.S.C. § 12111(8).  Disability is defined by the ADA as (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(2).  McGee makes a claim pursuant to the first two prongs of § 12102(2), and both are discussed in turn.

i.      Disability that Substantially Limits a Major Life Activity

McGee asserts that he "is and was a person with a disability, extreme high blood pressure, anxiety, and acute depression, all of which substantially limits one or more major life activities as defined by the ADA."  Among the "major life activities" recognized pursuant to ADA regulations are "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 CFR 1630.2(I); *see also Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 382 (3d Cir. 2004) (relying on 29 CFR 1630.2(I) as a "representative – but not exhaustive – list of functions that should be deemed major life activities").

The Third Circuit has summarized the above standards for establishing a statutorily protected disability on this basis as requiring the employee to (1) show that he has an impairment, (2) identify the life activity that he claims is limited by the impairment, and (3) prove that the limitation is substantial.  *Fiscus*, 385 F.3d at 382 (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)).  Using this framework, McGee must establish that he was diagnosed with depression, identify one or more major life activities that his

11

depression has inhibited, and show that this limitation is substantial.  *See id.*; *see also*

*Reed v. Medical College (Tenet)*, No. Civ. A. 03-4010, 2004 WL 2861874, at *3 (E.D. Pa.

Dec. 10, 2004) (finding that depression can be considered a disability when depression

substantially limits a major life activity).

　　　　To this end, McGee claims that his depression has led to an inability to sleep, lack

of energy, fatigue, digestive problems, poor attention and diminished concentration.  He

also asserts that his driving was affected by his medication, that his ability to

communicate and interact with his peers was diminished, and that it took him more time

to do his job.  McGee further claims that his condition was aggravated when he was

unstaffed in 2000, and that he suffered from cognitive problems, bowel problems, and

that his thoughts and movements were slowed.  Finally, McGee alleges that as a result of

his depression and unstaffing, he no longer enjoys life, feels hopeless, is socially isolated

and cannot handle crowds.

　　　　Defendants move for summary judgment on McGee's disability discrimination

claim, arguing that McGee can not prove that any impairment substantially limited a

major life activity, and the court agrees.  The claim is facially flawed because nowhere in

his materials does McGee identify the major life activities that he believes have been

substantially limited by his depression, which is required under prong two of the *Ficus*

analysis.  Instead, at the outset of this litigation, he merely asserted that his depression

"substantially limits one or more major life activities as defined by the ADA," pl.

amended complaint at 14, but then never offered any evidence or made further arguments

regarding which "major life activities" he was referencing.  Moreover, the discussion of

his inability to sleep, lack of energy, digestive problems, and cognitive difficulties, *inter*

*alia*, does not shed light on which of the major life activities McGee believes have been

limited.[5]  Consequently, McGee's ADA disability discrimination claim based on

limitations on major life activities cannot succeed.[6]

        ii.      <u>Record of Disability</u>

---

    [5] McGee does not argue that any of these myriad problems would themselves
qualify as "major life activities."

    [6] Even had McGee identified life activities that are substantially limited by his
depression, summary judgment on this ADA disability claim would be in order.  The only
major life activity that McGee could plausibly claim to have been substantially limited by
his depression is the major life activity of working.  To be substantially inhibited from the
major life activity of working, a plaintiff must show that he or she is "'unable to work in a
broad class of jobs.'"  *Tice v. Centre Area Transportation Authority*, 247 F.3d 506, 512
(3d Cir. 2001) (quoting *Sutton v. United Air Lines, Inc*. 527 U.S. 471, 491 (1999)).  "To
be substantially limited in the major life activity of working, then, one must be precluded
from more than one type of job, a specialized job, or a particular job choice."  *Id*.

    In this respect, the only relevant allegation was that it took McGee longer to do his
job when he returned from his leave of absence in 1998.  Pl. Dep. 60.  Simply requiring a
longer time to do one's job is not a significant restriction on "condition, manner or
duration" as is required under the regulations.  *See* 29 C.F.R. § 1630.2(j)(1)(ii) (2006)
("The term substantially limits means . . . significantly restricted as to the condition,
manner or duration under which an individual can perform a particular major life activity
as compared to the condition, manner, or duration under which the average person in the
general population can perform that same major life activity.").  Additionally, in his
complaint, McGee notes that he "could perform all of the essential functions of the
position of accounts manager and salesman with or without reasonable accommodations."
First Amended Complaint at 15.  Therefore McGee would not be able to prove that he is
substantially limited by his depression from working even if he had identified this major
life activity as the source of his ADA discrimination claim.

McGee also claims that he is an individual with a record of a disability.  For McGee to show that he had a record of disability, he must show that he had a record of some condition that would be considered a disability under the ADA.  *Tice v. Centre Area Transportation Authority*, 247 F.3d 506, 513 (3d Cir. 2001).  Because McGee cannot prove that he has a disability under the act, he also cannot show that he has a record of disability that would make him a qualified individual under the ADA.  Therefore, McGee's disability discrimination claim fails on this basis as well.

      b.    <u>Disability Retaliation under the ADA</u>

McGee also claims that P & G retaliated against him in violation of the ADA.  42 U.S.C. § 12203(a) contains the relevant language on ADA retaliation claims.  It provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  Based on this language, the Third Circuit has held that an ADA retaliation claim may be brought pursuant to § 12203(a) even when a plaintiff's disability discrimination claim is unsuccessful.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 498 (3d Cir. 1997); *see also Wright v. CompUSA Inc.*, 352 F.3d 472, 474-78 (1st Cir. 2003) (finding that a plaintiff's ADA discrimination claim failed, but nonetheless concluding that the plaintiff could survive summary judgment on his disability retaliation claim).  Therefore, "in order to establish a prima facie case of illegal retaliation under the

anti-discrimination statutes, a plaintiff must show: '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 759 (3d Cir. 2004) (quoting *Fogleman v. Mercy Hosp., Inc.*, 238 F.3d 561, 567-68 (3d Cir. 2002)).

With respect to the first ingredient of a retaliation claim, it appears that McGee may be able to show at trial that he engaged in a statutorily protected activity when he requested accommodation in 1998 in the form of a three-month absence. Some types of activity, such as filing a complaint with the EEOC, are clearly statutorily protected. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003). However, protected activity also includes a request for accommodation; a plaintiff does not have to file an official complaint in order for the activity to be considered protected. *Id.* at 191 ("The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC."). In March of 1998, McGee took a three-month leave of absence to treat his depression, acute anxiety, and hypertension. Because a jury may find that this request for accommodation was made in good faith, McGee could make a prima facie showing that he engaged in protected employee activity.

McGee next has to prove that he suffered an adverse employment action. Recently, in *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006), the

Supreme Court clarified the degree of material adversity an employer action must cause before a plaintiff may bring a Title VII retaliation claim.[7]  The Court concluded that a retaliation plaintiff meets her burden when she shows that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id*. at 2415 (quotation marks and citation omitted).  The Court further emphasized that "context matters" and things seemingly as trivial as a schedule change or a supervisor declining to invite an employee to lunch may qualify as material adverse employee actions under the right circumstances.  *Id*. at 2415-16.[8]

Applying this standard to the facts before it in *White*, the Court concluded that the plaintiff had met her burden.  The plaintiff in *White* had been reassigned from a fork lift operator position, which required more qualifications, to track labor duties, which were "by all accounts more arduous and dirtier."  *Id*. at 2417.  Though both duties fell within the same job description, the Court had no difficulty concluding that "[c]ommon sense suggests that one good way to discourage an employee such as White from bringing

---

[7]  "[R]etaliation claims under the ADA are analyzed under the same framework as Title VII discrimination claims*." Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183 (3d Cir. 2003) (citation omitted).

Though not at issue in this case because McGee is claiming adverse employment actions, the *White* Court also held that the anti-retaliation provision of Title VII does not limit the forbidden actions and harms to only those that are related to employment or that occur at the workplace.  126 S. Ct. at 2414.

[8]  The *White* Court noted that the schedule change may matter immensely to a working mother with school age children and a supervisor's failure to invite an employee to lunch might qualify as a material adverse change if the lunch is recurring and it is conceived as an employee training tool.  126 S. Ct. at 2415-16.

16

discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Id*. at 2416.  The Court also found that a 37-day suspension of the plaintiff without pay was an adverse employment action, even though Burlington ultimately reinstated the plaintiff with backpay.  Noting that the plaintiff and her family had to go 37 days without income and "did not know during that time whether or when [the plaintiff] could return to work," the Court reasoned that "[m]any reasonable employees would find a month without a paycheck to be a serious hardship." *Id*. at 2417.

McGee alleges that he was subjected to a number of adverse employment actions.  He claims that defendants refused to change his employment rating from "2" to "1," which he claims deprived him of benefits such as bonuses, options, increased raises and increased profit sharing.  McGee was also selected by P & G for unstaffing in the reorganization of 2000.  Moreover, the jobs that McGee was offered after his unstaffing were a significant change in his employment: one of the jobs required him to relocate to Pittsburgh while another was a demotion from his current position.  Pl. Opp. at 12.  Under *White*, these actions – the change in his employment rating, the unstaffing, and the jobs offered following his unstaffing – are easily of the type that a jury could conclude "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  126 S. Ct. at 2415.

Finally, McGee must establish that there is a causal connection between his

17

protected activity and the adverse actions that he claims to have suffered.  Though not

close in time to his March of 1998 accommodation request, McGee may be able to

establish a causal connection between the accommodation request and the adverse actions

by other types of circumstantial evidence.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d

271, 280-81 (3d Cir. 2000).  The Third Circuit in *Farrell* emphasized that it has "set forth

no limits on what we will be willing to consider," and, therefore, courts should be

"willing to explore the record in search of evidence."  *Id.* at 281.

Here, McGee argues that there is sufficient evidence to support an inference of

animosity on the part of P & G managers.  McGee alleges that Monserez continued to

treat him badly after Guenther was removed as his supervisor, that Monserez refused to

return his rating to "1"despite deserving a "1" rating, and that Monserez did not find a job

for him during the reorganization.  He notes all of this treatment came after his 1998

leave of absence.  Because, as Guenther's manager, Monserez was significantly involved

in the events leading up to McGee's leave of absence in 1998, and because Monserez

supervised McGee following the 1998 leave of absence, a jury could conclude that a

causal connection exists.

Moreover, there is a material issue of fact as to who was involved in the decision

to not assign McGee a position in the new geographic-based team after he was unstaffed

from his customer-focused team.  P & G claims that the decision was made by Kirk

Trofholz, who testified that he was unaware of McGee's complaints against Guenther at

the time of his decision; however, P & G initially asserted in a letter to McGee's attorney

that "Trofholz was not involved in the decision to select Plaintiff for non-assignment in

2000." Pl. Exh. Q.  It is possible that this statement referred to the first decision to

unstaff McGee,[9] but should McGee be able to prove that Monserez – who was well aware

of McGee's previous leave of absence – played a role in denying McGee a position on the

newly formed geographic-based team, a jury might conclude that there is a causal

connection between the adverse employment actions and McGee's statutorily protected

activity.  Consequently, McGee's claim meets this aspect of the retaliation test.

_____Accordingly, defendants' motion for summary judgment on McGee's retaliation

claim will be denied.

2.   Pennsylvania Human Relations Act

McGee's second cause of action is a disability, age discrimination, and sexual

harassment retaliation claim under the Pennsylvania Human Relations Act ("PHRA"), 43

Pa. Cons. Stat. § 951 et seq.  The PHRA prohibits an employer, *inter alia*, from

discharging or otherwise discriminating against an employee on the basis of age or non-

job related disability.  43 Pa. Cons. Stat. § 955(a).[10]  Though not required to do so,

_____

[9]  *See supra* note 3.

[10]  The PHRA reads in relevant part:

       It shall be an unlawful discriminatory practice, ... (a) For any
       employer because of the race, color, religious creed, ancestry, age,
       sex, national origin or non-job related handicap or disability or the

                                   (continued...)

Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts, including the ADA and Title VII. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996). Additionally, the definition of disability in the PHRA is substantially the same as under the ADA. *Id.* at 105.

Defendants' motion for summary judgment on all of McGee's PHRA claims is granted because the PHRA complaint was not timely filed. The PHRA requires "[a]ny complaint filed pursuant to this section must be so filed within one hundred eighty days after the alleged act of discrimination . . ." 43 Pa. Cons. Stat. § 959(h); *see also Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997). This requirement is rigorously observed. The *Woodson* court wrote:

> To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination. 43 Pa. Cons. Stat. §§ 959(a), 962. If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA. The Pennsylvania courts have strictly interpreted this requirement, and have repeatedly held that "persons with claims that are cognizable under the Human Relations Act must avail themselves of the

---

[10](...continued)

> use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 Pa. Cons. Stat. § 955(a).

20

administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act." *Vincent v. Fuller Co.*, 616 A.2d 969, 974 (Pa. Super. Ct. 1992).

The last possible discriminatory event in the record is McGee's unstaffing on March 13, 2000. Therefore, McGee had until September 9, 2000 – 180 days after March 13, 2000 – to file his PHRA complaint. McGee acknowledges that he did not file a complaint with either the EEOC or the PHRC until September 22, 2000 at the earliest. Consequently all of McGee's PHRC claims are time barred, and summary judgment is granted to the defendants.[11]

3.   Breach of Contract[12]

Summary judgment will also be granted in favor of defendants on McGee's breach of contract claim. McGee claims that the defendants "improperly denied [him] benefits, rights and expectancies due him and improperly qualified, conditioned and terminated his employment[.]" First Amended Complaint at 20. He further asserts that he had taken "substantial financial and personal commitments which were well known to [d]efendants and which were incurred in part on reasonable and known reliance on [d]efendants' continued assurances of continuing employment and remuneration in accordance with his

---

[11] It is to be noted that even if McGee's PHRA disability claim had been timely filed, it would have been treated as coextensive with the federal claim, and summary judgment would have been granted for the reasons discussed, *supra*, in section 1(a).

[12] For the purposes of reviewing this claim in the context of defendant's motion for summary judgment, McGee's employment by P & G will be treated as terminated. *See supra* note 4.

prior work and compensation." *Id*.  Finally, he argues that the "parties had . . . understood and agreed that [McGee] would continue as an account manager or higher, in accordance with his work history and performance until he would qualify for . . . permanent retirement benefits." *Id*. at 20-21.

Under Pennsylvania law, however, "[a]bsent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason." *Geary v. United States Steel Corp.*, 319 A.2d 174, 176 (Pa. 1974).  Employment in Pennsylvania is presumed to be at-will unless there is an express contract, or an implied agreement with additional consideration, that allows the court to infer that the parties did not intend the employment to be at-will. *Permenter v. Crown Cork & Seal Co.*, 38 F. Supp. 2d 372, 377 (E.D. Pa. 1999).  There is no evidence to show, and McGee does not contend, that he ever signed a written employment contract.  Because, then, McGee was an at-will employee, who could be fired for "any or no reason," neither his understanding nor unwritten assurances by the defendant that McGee "would continue as an account manager or higher" will sustain his breach-of-contract claims.

McGee further argues that – even if he could be terminated at-will – P & G created a unilateral employment contract with him when it offered "Recognition Shares" during P & G's 1999/2000 reorganization.  Recognition Shares are stock options awarded to exemplary employees.  In support of this claim, McGee relies on *Pilkington v. CGU*

*Insurance Co.*, No. Civ. A. 00-2495, 2000 WL 33159253 (E.D. Pa. Feb. 9, 2001).   In

*Pilkington*, the plaintiff was terminated after a claim of sexual harassment was made

against him.  *Id*. at *1.  The company had offered a bonus program in which employees

were rewarded for each quarter of service, so long as they retained their job.  *Id.* at *7.  At

the end of each quarter, employees were paid one-third of the bonus money they were

due, and were promised that they would receive the other two-thirds at the end of the

year.  *Id.*  The plaintiff was fired during the year, and did not receive the second portion

of the bonus that he had already earned.  *Id.*  The court found that the employer was

required to pay him the bonus money that he had earned during the time that he was

working, so long as his termination was improper.  *Id.* (citing *Donahue v. Fed. Express

Corp*., 753 A.2d 238, 242 (Pa. Super. Ct. 2000)).

McGee reads *Pilkington* to mean that the bonus agreement in that case created a

unilateral contract between the parties.  However, *Pilkington* is not factually similar to

McGee's situation.  Unlike the plaintiff in *Pilkington*, McGee was never given anything

more than a general promise – given to all employees – that Recognition Shares would be

awarded to top employees.  Nor does McGee present evidence that he ever received any

of these shares or was one of the "outstanding" employees who would be recognized.

Instead, McGee simply states that his performance was exemplary, and that he failed to

receive the shares.  Thus, McGee has not shown that a contractual relationship exists

between himself and P & G that would entitle him to any of the Recognition Shares.  So,

unlike the situation presented in *Pilkington*, no unilateral contract arose between McGee and defendant P & G.  Accordingly, summary judgment is granted to defendants on the entirety of McGee's breach of contract claim.

       4.    <u>Breach of the Implied Duty of Good Faith and Fair Dealing</u>

Defendants will also be granted summary judgment on McGee's breach of the implied duty of good faith and fair dealing claim because McGee is an at-will employee. Pursuant to Pennsylvania case law, an employee "cannot as a matter of law maintain an action for breach of the implied duty of good faith and fair dealing, insofar as the underlying claim is for termination of an at-will employment relationship." *Donahue v. Federal Express Corp.*, 753 A.2d 238, 243 (Pa. Super. 2000).  Even if it were true – as McGee argues – that P & G did not follow its own standards for staffing during the reorganization, McGee's at-will status negates the claim that his 2000 unstaffing created a breach of the implied duty of good faith and fair dealing.

       5.    <u>Negligent Supervision</u>

Finally, summary judgment will be granted on McGee's negligent supervision claim.  Under Pennsylvania law, there is a two-year statute of limitations on "an action to recover damages for injuries to the person . . . caused by the . . . negligence of another." 42 Pa. Cons. Stat. § 5524(2).  Clearly coming within this provision is McGee's claim that P & G was negligent in its supervision of Guenther, Monserez, and Art Sprague, a P & G employee.  Because McGee stopped working with Guenther and Sprague in March of

1998, and did not file his claim until March 4, 2002, this claim is time-barred insofar as it involves these individuals.

As for McGee's negligent supervision claim with respect to Monserez, that claim is not time-barred because McGee continued to work with Monserez until approximately March 13, 2000, and he filed his complaint on March 4, 2002, which falls just within the two-year limitations period.  The substance of McGee's supervisory negligence claim is governed by Pennsylvania's Worker's Compensation Act ("WCA"), which states that it is the exclusive remedy for any work-related injury suffered by the employee.  77 Pa. Cons. Stat. § 481(a).  Under the WCA, employers have immunity from suits for injuries that flow from work-related incidents that are caused by a third-party.  *Id.* § 481(b). Consequently, under Pennsylvania law, P & G cannot be held liable to McGee for injuries caused by a fellow P & G employee.

McGee nonetheless claims that Monserez's actions fall within the "personal animus exception" to the WCA.  That exception provides that the WCA does not bar relief where the injury was "caused by the act of a third person intended to injure the employee because of reasons personal to him, and not directed against him as an employee or because of his employment."  77 Pa. Cons. Stat. § 411(1).  This provision has been interpreted to permit an employee to maintain a common-law tort action against his employer "whenever his or her injury is the result of an attack or assault by a third person or fellow employee for reasons that are personal to the attacked and not connected

25

with the victim's employment." *Vosberg v. Connolly*, 591 A.2d 1128, 1131 (Pa. Super. Ct. 1991).

In order to come within the "personal animus exception," "the third party's or fellow employee's act must have been motivated by his animosity against the injured employee. If the third party would have attacked a different person in the same position as the injured employee, the attack falls outside the 'third party attack exception.'" *Id.* Moreover, Pennsylvania courts "have construed this provision in a narrow manner[.]" *Fielder v. Morris Coupling Co.*, 784 A.2d 812, 815 (Pa. Super. Ct. 2001) (concluding that the appellant "failed to provide evidence of either a history of animosity between himself and [the attacking employee], or that [the attacking employee] intended to injure him for personal reasons"); *Abbott v. Anchor Glass Container Corp.*, 758 A.2d 1219, 1224-25 (Pa. Super. 2000) (finding that the widows of deceased supervisors shot on the job by a co-worker after a dispute on a work-related issue could not recover under the personal animus exception); *Vosberg*, 591 A.2d at 1131-32 (finding that exception did not apply when the origin of the argument was work related). Finally, the burden of proof is on the party arguing the exception. *See Fielder*, 784 A.2d at 815.

With these principles in mind, it is apparent that McGee has not met his burden of adducing evidence tending to show that Monserez's actions were rooted in personal animus. McGee asserts that Monserez maintained some personal animus, but the record evidence does not support this assessment. In support of his claim, McGee points to the

26

fact that Monserez did not return McGee to his previous ranking of "1" once Guenther was removed as his supervisor.  However, the evidence in the record indicates that in 1998 Monserez articulated a number of *work*-related reasons for his dissatisfaction with McGee's *work* performance.  These include Monserez's belief that  McGee caused "tension" with his colleagues over the years, "inappropriate and unprofessional" work behavior, and inappropriate customer contact.  Pl. Opp. Exh. L.  Though McGee disputes Monserez's characterization of these incidents, they are work-related incidents, and, therefore, do not provide support for the "personal animus exception" to the WCA.[13]  In sum, summary judgment will be granted to defendants on the supervisory negligence claims.


## Conclusion

An accompanying order implements this opinion's rulings.

---

[13] McGee contrasts Monserez's criticism of him over the years with  Monserez's support of his reassigned manager,  Guenther.  The fact that Monserez was supportive of Guenther does not, however, support an inference that Monserez's criticism of McGee was personal as opposed to professional.